IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 8, 2017

## STATE OF TENNESSEE v. BRANDON CHRISTOPHER SCOTT

**Appeal from the Criminal Court for Davidson County
No. 2015-B-1238    Cheryl A. Blackburn, Judge**

_____

### No. M2016-02362-CCA-R3-CD
_____

The Defendant, Brandon Christopher Scott, was sentenced to an effective twenty-five-year sentence for his guilty-pleaded convictions to attempted first degree murder and reckless endangerment. On appeal, the Defendant contends that the trial court failed to provide adequate analysis in support of its decision to enhance his sentence to the maximum within the range for a Class A felony, failed to assign enough weight to the one mitigating factor it found applicable, and failed to apply two additional mitigating factors. Additionally, the Defendant submits that his enhanced sentence does not comport with the purposes and principles of our Sentencing Act. Following our review, we find no abuse of discretion in the trial court's sentencing decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and J. ROSS DYER, JJ., joined.

Michael A. Colavecchio, Nashville, Tennessee, for the appellant, Brandon Christopher Scott.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Pamela S. Anderson, Assistant Attorney General, for the appellee, State of Tennessee.

## OPINION
### FACTUAL BACKGROUND

In May 2015, the Davidson County Grand Jury indicted the Defendant on three counts each of attempted first degree murder, employment of a firearm during the

commission of a dangerous felony (with a previous dangerous felony conviction), and reckless endangerment. See Tenn. Code Ann. §§ 39-11-106, -12-101, -13-103, -13-202, -17-1324. The Defendant was charged along with three co-defendants—Jamar D. Medaries, Porcha J. Medaries, and Vadra L. Jackson. In addition, the attempted murder and firearm charges named three different victims—one victim being an eleven-year-old boy, K.M.,[1] and the reckless endangerment charges listed three separate residences.

Thereafter, the Defendant entered a guilty plea to one count of attempted first degree murder involving serious bodily injury of the eleven-year-old boy[2] and one count of reckless endangerment. At the guilty plea hearing, the State recited the facts it would have presented at trial as follows:

> [O]n March the 22nd of 2015 a co-defendant, Porscha Medaries, and Vadra Jackson, had an altercation at a residence on Fern Avenue that resulted in the two of them leaving that location and making contact with other persons who included Robert Meadries as well as Jamar Medaries. Jamar Medaries is a friend of the [D]efendant['s] . . . . A short time later the group appeared back in separate vehicles to the location at Fern Avenue. Jamar Medaries was armed with a .40 caliber weapon. [The Defendant] arrived in his own vehicle and was in possession of a .380 caliber pistol. The two women made statements about shooting up the residence, and Jamar Medaries and the [D]efendant . . . both fired their weapons. There were three separate residences that were struck by gunfire. Based on witness descriptions of the two shooters and the location where they were each standing police were able to determine that the shell casings from the gun fired by [the Defendant] was, in fact, the .380 weapon. One of those bullets penetrated the residence at 126C Fern Avenue. . . . [K.M.], who was eleven-years old at the time[,] . . . was inside the home when the bullet penetrated the home and struck [K.M.] in the back of his head. The bullet penetrated his skull and caused severe brain damage. Miraculously he did survive, though, he has permanent life altering injuries both physically and mentally.
>
> The proof in this case would be based upon witness descriptions of what [the Defendant] was wearing, what he was driving, as well as a co-defendant's testimony and cell phone record—call details recording confirming the communication between [the Defendant] and [Jamar

---

[1] To protect the anonymity of the minor, we will refer to him by his initials.

[2] If a defendant is found guilty of attempted first degree murder "where the victim suffers serious bodily injury as defined in § 39-11-106," then the defendant is not eligible for release until serving eighty-five percent of his or her sentence. Tenn. Code Ann. § 40-35-501(k)(5).

Medaries] as well as cell tower information that tracked and showed [the Defendant's] telephone at a different location in arriving to the Fern Avenue location, leaving from that location, and going to an apartment where the other codefendants also arrived. Gwenester Calloway, . . . was the girlfriend of Robert Medaries, and she told police about the group of individuals that arrived at her home shortly after the shooting. And she did, in fact, pick out [the Defendant] as being one of those individuals as well as Porscha Medaries and Jamar Medaries.

The Defendant agreed to the State's factual stipulation.

Pursuant to the terms of the plea agreement, the Defendant was classified as a Range I, standard offender, and he received a six-year sentence for the reckless endangerment conviction, which was to be served concurrently with the sentence to be imposed for the attempted first degree murder conviction. The length of the attempted first degree murder sentence was left to the trial court's discretion.

At the subsequent sentencing hearing,[3] Detective John Grubbs with the Metropolitan Nashville Police Department, Youth Services Division, testified that he investigated the Fern Avenue shooting, including viewing the crime scene and the location of "projectile strikes and casings." Detective Grubbs confirmed that three different residences were struck by gunfire on March 22, 2015—address numbers 124, 126B, and 126C. According to Detective Grubbs, the eleven-year-old victim lived in unit 126C, and the "prelude event involving an altercation a little bit earlier in the day" occurred at 126B. Detective Grubbs testified that the eleven-year-old boy was standing in the doorway of his residence when he was shot, and a photograph reflected that a bullet pierced the door's glass window before striking the boy.

"[B]ased upon witness interviews and the projectile evidence and casing evidence[,]" Detective Grubbs was able to determine that there were two shooters, one using a .40 caliber weapon and the other shooting a .380 caliber weapon. Detective Grubbs verified that a .380 caliber bullet was recovered from the eleven-year-old victim's skull. Detective Grubbs further testified that there were other children present in the immediate area just prior to the shooting.

On cross-examination, Detective Grubbs agreed that the Defendant "was not present at the prelude event" that involved Porscha Medaries and the residents of 126B. Detective Grubbs further verified that the Defendant communicated with Jamar Medaires by phone just prior to the shooting but that the Defendant did not communicate with anyone else involved.

---

[3] The sentencing hearing was a joint proceeding for the Defendant and Porscha Medaries.

Detective Grubbs also described the "prelude altercation." He explained that "it was an argument over a relationship between three females there at the residence[,]" that the argument "turned physical[,]" and that "one of the people inside that residence end[ed] up shooting a gun during the altercation[.]" Additionally, Detective Grubbs received information that, when Porscha Medaries returned to the Fern Avenue location, accompanied at that time by the Defendant and Jamar Medaries, she made "threats [to the 126B occupants . . . that the house was about to be lit up[.]"

On redirect, Detective Grubbs testified that, as a result of his investigation, it was "learned through cell tower information and defendants' statements that all of the parties except Vadra Jackson convened . . . after the shooting over at an apartment complex[.]"

Sharnessa Sparks testified that she considered the eleven-year-old victim, K.M., her nephew because she was engaged to K.M.'s uncle, that K.M. was visiting his grandmother at 126C on the day he was shot, and that K.M.'s siblings were also there that day. Ms. Sparks described K.M. as "always active, fun, happy, very independent, just a happy little boy[,]" prior to the shooting.

Ms. Sparks received a call to go to Vanderbilt Hospital after K.M. was shot in the back of the head. When Ms. Sparks arrived at the hospital, "[t]hey didn't think he was going to make it." According to Ms. Sparks, K.M.'s parents were told to call out-of-town family members and make funeral arrangements; K.M. was comatose for several weeks before regaining consciousness; and K.M.'s injuries required multiple surgeries.

After spending several months in the hospital, K.M. was released and went to Atlanta for rehabilitation. Ms. Sparks relayed that K.M. "was not mobile at that time" and could not "do much on his own[,]" explaining that K.M. was wheelchair-bound, could not speak or bathe himself, and wore a diaper. K.M. also lost vision in one of his eyes "for a while." According to Ms. Sparks, the right side of K.M.'s body was greatly affected by the bullet.

After approximately two months in Atlanta, K.M. returned to Tennessee and lived with his paternal grandmother. Upon his return, K.M. was still in a wheelchair and unable to feed himself. He had to wear a helmet anytime he went outside to protect his skull. Ms. Sparks explained why K.M. required a helmet:

> Because of the surgeries with his head they had to remove half of his skull because of the swelling of his brain. So when he first came home, they hadn't put that plate back in or whatever they do. They hadn't done that yet, so he had to wear the helmet in case he fell or something.

Ultimately, K.M.'s skull was repaired following more surgery.

Ms. Sparks stated that, at the time of sentencing hearing, K.M. still walked with a limp, could not "use anything on the right side[,]" was unable to dress himself, required assistance tying his shoes, needed help getting in and out of the bathtub, was unable to "open certain things[,]" and had to wear a brace, which he sometimes needed assistance putting on. Furthermore, K.M. would still get confused and forget relatives' names, had fallen behind in school, could not talk in complete sentences, and would get scared upon hearing sounds, according to Ms. Sparks. In addition, Ms. Sparks stated that K.M.'s medical bills had imposed a financial hardship on the family.

The Defendant's father, Roderick Scott, testified that the Defendant was living in his home in March 2015 and that the Defendant was twenty-two-years old at that time. Moreover, the Defendant had a one-year-old son at the time of the sentencing hearing. In addition, the Defendant had worked "the majority of time" since he finished high school, according to Mr. Scott.

Mr. Scott stated that he had been employed as a captain with the Tennessee Department of Correction ("DOC"), that he had worked for the DOC for thirty-two years, and that his wife was also a captain with the DOC. According to Mr. Scott, the Defendant could live with them upon his release from prison.

On cross-examination, Mr. Scott acknowledged that the Defendant was living with him in 2009 when the Defendant burglarized the home of a neighbor. The Defendant, a juvenile at the time, was adjudicated delinquent for this act and placed on probation. Mr. Scott agreed that the Defendant violated that probation. Additionally, after the Defendant turned eighteen, he was convicted of theft.

Mr. Scott further confirmed that the Defendant, in 2011, burglarized the home of "the ex-girlfriend of a friend of his[,]" that the Defendant was convicted of aggravated burglary and received a three-year sentence for that crime, and that the Defendant was placed on probation as part of his sentence. Mr. Scott affirmed that the Defendant committed a theft in 2013 while on probation for the aggravated burglary and that the Defendant was living with him at that time. Moreover, after being arrested for aggravated assault, the Defendant pled guilty to simple assault, and his probation on the aggravated burglary conviction was revoked as a result. In addition, Mr. Scott agreed that the Defendant was still on probation when he committed the present offenses, although that probation was about to end, and that it was illegal for the Defendant to possess a gun as a convicted felon.

When asked if the Defendant had ever held down a job for more than six months, Mr. Scott replied, "No, not to my knowledge." Also, Mr. Scott was aware that the Defendant affiliated with the Gangster Disciples, although the Defendant was not a "[m]ember" "to his knowledge."

The Defendant then testified, noting that he was voluntarily submitting to cross-examination. The Defendant relayed his employment history, which included jobs at Burger King, FedEx, Advantage Distribution, Cheeseburger Charley's, and Tyson. According to the Defendant, "with the exception of a few gaps or a few months here and there," he had worked since finishing high school.

Regarding his physical and mental health, the Defendant described it as "pretty good[.]" However, he acknowledged that he was using marijuana frequently in 2014 and 2015. According to the Defendant, "right before" turning eighteen, he participated in "out-patient treatment" for his substance abuse problem. Moreover, the Defendant agreed with his criminal history as summarized during his father's testimony.

The Defendant then depicted the events that occurred during the afternoon of March 22, 2015. The Defendant stated that, while en route to pick his brother up from work around 2:00 p.m. that day, he received a call from his longtime friend Jamar Medaries. Jamar[4] told the Defendant that Jamar's neice, Porscha Medaries, had been fired upon at the Fern Avenue address, and Jamar asked the Defendant to meet him at that location. After the Defendant dropped his brother off, he proceeded over to the Fern Avenue location "to basically make sure everything was okay." The Defendant testified that Jamar did not ask him to bring a gun and that Jamar did not tell him that he was bringing a weapon.

When the Defendant arrived at the Fern Avenue address, Jamar, Porscha, and the "other girl" were standing outside of Jamar's car. Robert Medaries, Jamar's brother, was also present on the scene, arriving in yet another vehicle.[5] According to the Defendant, "[t]he girls were really more the frantic ones, the ones, you know, yelling" towards the occupants inside the house. The Defendant believed that someone was standing in the doorway of the residence.

The Defendant exited his car "trying to figure out what was going on[.]" He did not see Jamar with a gun at that time, but because he "knew there [were] guns present at the house[,]" he grabbed his gun out of his car. The Defendant claimed that Jamar was the first one to fire his weapon and that he was about "[a] car length" away from Jamar when Jamar fired. The Defendant could not tell if gunfire was coming from inside the house, but his reaction was also to fire upon the residence to make sure "no type of harm came" to his friends. According to the Defendant, no one instructed him to fire at a particular residence, and he did not shoot at a specific house. The Defendant affirmed that he shot his gun six or seven times. When the Defendant realized that no one was

---

[4] Because the parties share a surname, we will refer to them by their first names for clarity.
[5] Porscha testified that Robert's two children were inside his car.

"shooting back," he got in his car and left. The Defendant confirmed that most everyone involved in the shooting met at Robert's girlfriend's apartment later that day.

When the Defendant learned that a little boy had been hit during the gunfire, "it messed with [him] because . . . that was never the intention." He said that he was "on pins and needles" over the boy's being hurt. The Defendant proclaimed that it was "never [his] intention for anybody to get hurt[,] especially that little boy[,]" and that he "really apologize[d] for that."

On cross-examination, the Defendant confirmed that he was the one shooting a .380 caliber semi-automatic handgun and that he was the one who shot K.M. causing permanent brain damage. The Defendant said that he did not have the gun with him when he originally left that day but retrieved it after he dropped his brother off at the house. He admitted that he was not supposed to possess a gun and that he was violating his probation by doing so. According to the Defendant, he bought the weapon "off the street" a few months prior without his parents' knowledge, and he carried it "for protection."

The Defendant acknowledged that he "emptied [his] gun when [he] shot on the Fern Avenue" residence. Furthermore, the Defendant admitted that he did not offer to call the police for Jamar and Porscha, that he opened fire on the residents of 126B who had not brandished a weapon, that "there were people inside those buildings[,]" that "there were houses in that neighborhood behind those houses," and that he did not turn himself in after learning that K.M. had been injured during the shooting.

At the conclusion of proof, the trial court sentenced the Defendant to twenty-five years at eighty-five percent for the attempted first degree murder conviction. The case is now before us for our review.

ANALYSIS

On appeal, the Defendant argues that the trial court erred in sentencing him to the maximum punishment of twenty-five years for his attempted first degree murder conviction. The State responds that the trial court did not abuse its discretion in sentencing the Defendant. We agree with the State.

In this case, the Defendant, as a Range I, standard offender convicted of a Class A felony, was subject to a sentencing range of fifteen to twenty-five years for his attempted first degree murder conviction. See Tenn. Code Ann. § 40-35-112(a)(1). Before a trial court imposes a sentence upon a defendant, it must consider: (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics

of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b). When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). Moreover, appellate courts may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2007). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

In accordance with the broad discretion now afforded a trial court's sentencing decision, "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." Bise, 380 S.W.3d at 706. This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Id. at 709-10. Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," Tennessee Code Annotated section 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," Tennessee Code Annotated section 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," Tennessee Code Annotated section 40-35-103(5). Carter, 254 S.W.3d at 344.

Initially, the Defendant "asserts that the trial court did not adequately support the analysis of how the trial court arrived at a sentence above the minimum of fifteen years and at the maximum sentence of [twenty-five] years." In issuing its decision to enhance the Defendant's sentence to the maximum within the range, the trial court reasoned as follows:

> I have to consider the purposes of the [S]entencing [A]ct, which is found at 40-35-102, about the punishment being justly deserved in relationship to the seriousness of the offense, fair and consistent treatment, recognizing the state prison capacities are limited and this should be—that should be reserved to those possessing a disregard for law and morals of society[,] and failure of past efforts at rehabilitation and also just considering the seriousness of the offense.

-8-

I have to consider the following matters 40-35-210(b) spells out. I have to consider the evidence at the sentencing hearing, the presentence report[], the principles of sentencing, which I just went over . . . .

I may also consider the nature and characteristics of the criminal conduct, in doing so I can look behind the plea agreement and consider the true nature of the offenses committed, the enhancing and mitigating factors, . . . the statistical information, which the Administrative Office of the Courts provides for us to make sure our sentencing practices are somewhat consistent across the State, and the defendant's statement. [The Defendant] did testify in this case. . . .

In terms of enhancing factors I'm applying the following enhancing factors. Number one, he has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range. He has one prior felony, four prior misdemeanors. He also testified about his drug use. The presentence report indicates it was daily for a period of time until he was incarcerated even while he was on probation. And then he was possessing a gun while he was a convicted felon while he was on probation.

The next factor I'm going to look at is factor number four, that is, the victim of the offense is particularly vulnerable because of age or physical or mental disabilities. It would only be the factor of age at this point because his physical and mental disabilities didn't occur until this offense. He was an eleven-year-old sitting out or out in his yard playing, and he gets shot in the back of the head when somebody opens fire on, I guess, the events that took place next door. Since he was shot in the back of the head, he obviously had his back to them. He was, in fact, vulnerable at that particular point. He's an eleven-year old. He probably doesn't know how to dodge and duck and all that sort of thing. I'm going to find that factor does apply in this case.

The next one is that the defendant before trial or sentencing had failed to comply with conditions of a sentence involving release into the community. He had been on probation before and violated. He also was on probation as a juvenile and violated that probation. And that was before this event. So that factor applies.

Number nine, he possessed or employed a firearm, explosive device, or other deadly weapon during the commission of the offense. That is not

an essential element of attempted murder in the first degree. That factor clearly applies.

. . . .

Number thirteen applies, at the time of committing this he was on probation. He was on 2011-I-1349 probation.

And then factor number sixteen, he had previously been adjudicated to have committed a delinquent act as a juvenile which would constitute a felony if committed by an adult. That would be aggravated burglary. So those are the factors, one, four, eight, nine, thirteen, and sixteen that apply.

Looking at mitigation, I think it's factor number six . . . , because of youth or age he lacked substantial judgment in committing a crime. I do not find that factor mainly because he armed himself with a gun. I mean, he was armed. He had the gun, and he was on probation. And then he goes home and drops off his brother and then goes and gets the gun and goes to whatever he had in his mind to do. At his age he knew better. Every decision he made, at every point at which he could make a decision, he made the wrong one, but it wasn't because he didn't have judgment about it.

Factor number eleven, that it was under such unusual circumstances that it was unlikely to have a sustained intent to violate the law. Again, he arms himself with a gun, he had a gun while he was on probation, he's also been convicted of two aggravated burglaries, one as an adult. And more importantly he's taking multiple, multiple shots into a residence where everybody—he doesn't even see a gun. He has nothing to do with this. So I can't say that there's no sustained intent to violate the law.

But factor thirteen there is, that is the main thing he pled guilty. He took responsibility. With extensive cross-examination he told exactly what happened. So I am going to consider that factor.

So in looking at all the enhancing factors and all the mitigating factors . . . I'm going to sentence him to twenty-five years with an eighty-five percent release eligibility.

As depicted, the trial court performed an extensive analysis evidencing its reasons for imposing the maximum sentence, and the Defendant's argument to the contrary is unfounded.

-10-

Regarding the specific factors applied, the Defendant acknowledges that the trial court applied enhancement factors (1), (4), (8), (9), (13), and (16) to his sentence. See Tenn. Code Ann. § 40-35-114. He also notes that the trial court found the "catch-all" mitigating factor (13) applicable based upon the Defendant's entry of a plea and acceptance of responsibility for his actions. See Tenn. Code Ann. § 40-35-113(13). The Defendant makes no argument that any of the enhancement factors were improperly applied, instead, arguing that the trial court should have also found that the following mitigating factors applied: (1) that, because of his youth, he lacked substantial judgment in committing the offense; and (2) that he "committed the offense under such unusual circumstances that it [was] unlikely that a sustained intent to violate the law motivated the criminal conduct[.]" See Tenn. Code Ann. §§ 40-35-113(6), (11). According to the Defendant, "with the appropriate application of three mitigating factors and the application of six enhancement factors, the appropriate sentence should have been somewhere around the midpoint of the range, near [twenty] years[,]" or alternatively, "even with the application of several enhancement factors, the application of at least one mitigating factor should have allowed for a sentence below the maximum, or in the area of [twenty] to [twenty-two] years."

Additionally, the Defendant contends "that the sentence imposed in this case does not comply with the principles of sentencing pursuant to Tennessee Code Annotated [section] 40-35-103[,]" observing that a trial court is encouraged to impose sentences that are the "least severe measure necessary to achieve the purpose for which the sentence imposed." See Tenn. Code Ann. § 40-35-103(4). Furthermore, according to the Defendant, the trial court failed to consider his "potential or lack of potential for . . . rehabilitation or treatment," noting his illegal use of narcotics "for the entire time he was an adult" and that he has "received very little treatment for this problem." Moreover, the Defendant maintains that the trial court failed to consider his work history, remarking that he has been "employed consistently during the short time of his adulthood."

Much of the Defendant's argument relies upon the pre-Bise standard of review. For example, citing Tennessee Code Annotated section 40-35-401(d), the Defendant states that our review is "de novo . . . with a presumption that the trial court's determinations are correct if the record shows the trial judge considered the sentencing principles and all relevant facts and circumstances." However, our supreme court in Bise specifically stated, "[A]lthough the statutory language continues to describe appellate review as de novo with a presumption of correctness," the 2005 revisions to the Sentencing Act "effectively abrogated the de novo standard of appellate review." 380 S.W.3d at 707. Furthermore, the 2005 amendments to the 1989 Sentencing Act "deleted as grounds for appeal a claim that the trial court did not weigh properly the enhancement and mitigating factors." See Carter, 254 S.W.3d at 345.

-11-

The trial court specifically stated that it was considering the purposes and principles of the Sentencing Act, including whether the punishment was justly deserved in relation to the seriousness of the offense, whether the sentence assured fair and consistent treatment, and recognizing that state prison capacities are limited, so confinement should be reserved to those possessing a disregard for the laws and morals of society and evincing failure of past efforts at rehabilitation. See Tenn. Code Ann. §§ 40-35-102, -103. The trial court also noted the matters it was required to consider pursuant to section 40-35-210(b). Moreover, the trial court placed on the record what enhancement and mitigating factors it considered. See Bise, 380 S.W.3d at 706 n.41. The trial court's sentencing decision reflects that it thoroughly considered the purposes and principles of sentencing in rendering its ruling. Accordingly, the Defendant's within-range sentence is afforded a presumption of reasonableness.

The Defendant does not contest the applicability of any of the six enhancement factors or one mitigating factor found by the trial court. His argument is merely that the trial court should have given the one mitigating factor more weight than it did and that two additional mitigating factors should have been applied. Again, the Defendant fails to account for the 2005 amendments to our Sentencing Act. As noted above, the weight assigned to certain factors is no longer grounds for an appeal. See Carter, 254 S.W.3d at 345. Moreover, a trial court's erroneous consideration of some enhancement or mitigating factors, which are merely advisory, does not give this court grounds for reversal when the trial court otherwise conforms with the mandates of the Sentencing Act. See Bise, 380 S.W.3d at 709-10; Carter, 254 S.W.3d at 346. The record demonstrates that the trial court sentenced the Defendant in accordance with our Sentencing Act. Accordingly, we conclude that the trial court did not abuse its discretion by sentencing the Defendant to the maximum sentence of twenty-five years.

## CONCLUSION

Upon consideration of the foregoing, the Defendant is not entitled to relief. Accordingly, we affirm the judgments of the trial court.

_____

D. KELLY THOMAS, JR., JUDGE

-12-